**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| VELOCITY PATENT LLC, | |
| *Plaintiff,* | Civil Action No. 1:13-cv-08413 |
| v. | |
| MERCEDES-BENZ USA, LLC; | Judge John W. Darrah |
| MERCEDES-BENZ U.S. | Magistrate Judge Michael T. Mason |
| INTERNATIONAL, INC. | |
| *Defendants* | |
| | |
| VELOCITY PATENT LLC, | |
| *Plaintiff,* | Civil Action No. 1:13-cv-08413 |
| v. | |
| FCA US LLC | Judge John W. Darrah |
| | Magistrate Judge Michael T. Mason |
| *Defendant.* | |

**VELOCITY PATENT LLC'S MEMORANDUM OF LAW IN SUPPORT OF
VELOCITY'S CROSS MOTION FOR SUMMARY JUDGMENT OF INFRINGEMENT
OF THE FUEL OVERINJECTION NOTIFICATION CIRCUIT LIMITATION AND
OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT OF INDEFINITENESS OR, IN THE
ALTERNATIVE, NON-INFRINGEMENT OF U.S. PATENT NO. 5,954,781**

## TABLE OF CONTENTS

I.   Introduction ........................................................................................................... 1

II.  Legal standard ...................................................................................................... 3

    A.   Summary Judgment .................................................................................. 3

    B.   Indefiniteness ........................................................................................... 3

    C.   Infringement ............................................................................................. 3

III. The Asserted Claims Are Not Indefinite ............................................................. 4

IV.  The Accused Vehicles Infringe The Fuel Overinjection Notification Circuit Under
    Velocity's Construction ........................................................................................ 5

    A.   FCA ECO Index Gauge ........................................................................... 7

    B.   The FCA ECO Display ............................................................................. 8

    C.   The FCA Fuel Saver Mode Display ......................................................... 8

    D.   The FCA Instantaneous MPG v. Average MPG Displays ....................... 10

    E.   The Mercedes ECO Display .................................................................... 12

    F.   The Mercedes MPG and Range Display ................................................. 13

V.   The Accused Vehicles Infringe Under Any Construction That Is Consistent With
    The Intrinsic Evidence And Encompasses The Preferred Embodiment ......................... 14

VI.  The Accused Vehicles Infringe Under Defendants' Alternative Construction ................ 15

    A.   Defendants' Expert, Dr. Wilhelm, Is Unfamiliar With The Opinions In His
        Declaration .............................................................................................. 16

    B.   Defendants Mischaracterize The Record ................................................. 18

    C.   Defendants' Application of Their Alternative Construction to the Accused Products
        Imports New Limitations Not Found In Any Parties' Construction. .................... 20

    D.   The Accused Vehicles Include a Malfunction Light That Infringes Under
        Defendants' Alternative Construction. .................................................... 21

VII. Velocity Has Not Waived Any Argument That The Accused Vehicles Infringe
    Under The Doctrine Of Equivalents. ...................................................................... 23

VIII. Conclusion ......................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................................3

*Cent. Admixture Pharmacy Servs., Inc. v. Adv. Cardiac Solutions, P.C.*,
    482 F.3d 1347 (Fed. Cir. 2007).................................................................3

*In re Innovatio IP Ventures, LLC Patent Litig.*,
    956 F. Supp. 2d 925 (N.D. Ill. 2013).......................................................24

*Lantech, Inc. v. Keip Mach. Co.*,
    32 F.3d 542 (Fed. Cir. 1994)....................................................................3

*Microsoft Corp. v. i4i Ltd. P'ship*,
    131 S. Ct. 2238 (2011).............................................................................3

*Nautilus v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014).............................................................................3

*Recho, LLC v. Spin Master, Ltd.*,
    No. 13 C 2445, 2014 WL 1088517 (N.D. Ill. Mar. 17, 2014)................25

*Spectros Corp. v. Thermo Fisher Sci.*,
    No. C 09-01996, 2012 WL 1965887 (N.D. Cal. May 31, 2012)............25

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985)................................................................3

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014).............................................................................3

**Statutes**

35 U.S.C. § 282......................................................................................................3

35 U.S.C. § 282(a).................................................................................................3

**Other Authorities**

Fed. R. Civ. P. 56(a)..............................................................................................3

LPR 3.4.................................................................................................................24

## I.    INTRODUCTION

As explained in the specification of the '781 patent, vehicle fuel efficiency varies dramatically according to the way a driver operates a vehicle and improper operation by a driver may result in reduced fuel economy.  (Ex. 1 at 1:12-20.)   Corrective actions to improve fuel economy can be quite simple, such as a driver modifying how hard he/she presses down on the gas pedal, upshifting, downshifting, etc. (*Id*., Nran. Decl. at ¶¶ 28-30, 101; Ex. 20 at 81:12-82:7.) However, a driver can only take corrective action if the driver is aware of the improper driving style. (Nran. Decl. at ¶ 28; Ex. 1 at 1:23-27.)  The claimed inventions of the '781 patent solve this problem by issuing various visual and/or audible notifications to inform a driver that corrective action may be taken to optimize fuel economy.  (Ex. 1 at 13:41-45.)

The claimed "fuel overinjection notification circuit" is a simple and straight-forward example of a circuit that informs a driver that corrective action may be taken to increase fuel economy.   (Nran. Decl. at ¶ 48; Ex. 1 at 13:2-20, 13:36-45.)  This limitation is clearly defined in both the claims and the specification of the '781 patent.   The claims themselves define the "fuel overinjection notification circuit" as a circuit that issues a notification indicating "that excessive fuel is being supplied to said engine of said vehicle" and "that the vehicle is not being operated fuel efficiently." (Nran. Decl. at ¶ 48; Ex. 1 at cl. 1, 42.)   The specification makes unambiguously clear that this circuit "notif[ies] the driver that, in order to optimize vehicle operation, the amount of fuel being supplied to the engine should be reduced." (Nran. Decl. at ¶ 46; Ex. 1 at 13:2-7, 13:14-18.)  The claims and specification also make unambiguously clear that a separate and distinct limitation, the "processor subsystem" is responsible for determining "***when*** to activate said fuel overinjection circuit" based on data from one or more sensors.  (Nran. Decl. at ¶ 50; *See, e.g.*, Ex. 1 at cl. 1, 7, 12:64-13:20.)  Thus, the "fuel overinjection notification circuit" limitation does not require any measurement of fuel supply and is simply a circuit that indicates to a driver that he/she should reduce the amount of fuel supplied to the engine to increase fuel economy.

1

Based in part on the recent testimony of Defendants' expert, Dr. Wilhelm, Velocity now cross-moves for summary judgment of infringement of the "fuel overinjection notification circuit" limitation because the record shows that the claimed limitation is not indefinite and Defendants' accused vehicles include circuits within the scope of the claimed "fuel overinjection notification circuit" under both Velocity's and Defendants' "alternative" proposed constructions. All of the accused circuits have the same purpose and perform the same operation as the claimed "fuel overinjection notification circuit" under Velocity's construction because they notify the driver that the amount of fuel being supplied should be reduced to increase fuel economy. (Nran. Decl. at ¶ 99; Ex. 20 at 81:12-82:7, 166:18-167:11, 175:23-178:1.) Defendants' vehicles also infringe under Defendants' "alternative" construction because they incorporate circuits that illuminate a "malfunction light" if there is a fuel system malfunction.[1] (Ex. 20 at 40:5-43:23; Nran. Decl. at ¶ 104.)

Defendants moved for summary judgment of indefiniteness, alleging that the phrase "excessive fuel" is indefinite. In the alternative, Defendants moved for summary judgment of non-infringement only under their proposed "alternative" construction.[2] As explained above, and as set forth in Velocity's Claim Construction Brief (summarized below), the "fuel overinjection notification circuit" limitation is a simple and clear limitation that is not indefinite. Defendants' indefiniteness analysis is flawed because it focuses on the isolated phrase "excessive fuel" in a vacuum, instead of interpreting the claim limitation as whole with proper context. Moreover, Defendants fall far short of meeting their "burden of demonstrating that there is an absence of evidence to support" Velocity's infringement case because the evidence in the record

---

[1] Velocity does ***not*** agree that the claims encompass malfunction lights. However, to the extent that the Court adopts Defendants' construction, Defendants' vehicles infringe.

[2] Defendants' motion did not address infringement under Velocity's construction. If the Court rejects Defendants' construction, as it should, Defendants' motion for summary judgment of infringement must be denied.

confirms infringement. (D.E. 105[3] at 2, citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).)

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is not appropriate unless the moving party shows two things: (1) that there is "no genuine dispute as to any material fact," and (2) that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). In making this determination, "a court must view the evidence 'in the light most favorable to the opposing party.'" *Id.* (internal citations omitted). In other words, summary judgment is only appropriate when there are no genuine disputes of any material facts and when, drawing all justifiable factual inferences in favor of the non-movant, no "reasonable jury could return a verdict for the moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

### B. Indefiniteness

The law presumes that patents are valid. 35 U.S.C. § 282; *see also Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). Thus, the party challenging the validity of a patent due to alleged indefiniteness bears the burden of proof by clear and convincing evidence. 35 U.S.C. § 282(a); *Microsoft Corp.*, 131 S. Ct. at 2242; *Cent. Admixture Pharmacy Servs., Inc. v. Adv. Cardiac Solutions, P.C.*, 482 F.3d 1347, 1357 (Fed. Cir. 2007). Claims are not indefinite under 35 U.S.C. § 112 if, when read in light of the specification and prosecution history of the patent, the claims inform those skilled in the art about the scope of the invention with "reasonable certainty." *Nautilus v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).

### C. Infringement

The infringement inquiry is broken into two steps: "first, the claims must be interpreted to determine their proper scope; thereafter, the claims as thus interpreted are applied to the accused device." *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546 (Fed. Cir. 1994).

---

[3] Defendants FCA and Mercedes filed identical claim construction and summary judgment briefs in their respective cases. Citations to "D.E." refer to the Mercedes case (No. 1:13-cv-08413).

"Infringement, literal or by equivalence, is determined by comparing an accused product not with a preferred embodiment described in the specification . . . , but with the properly and previously construed claims in suit." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

## III. THE ASSERTED CLAIMS ARE NOT INDEFINITE

A person of ordinary skill in the art would understand the meaning and scope of the limitation "*fuel overinjection notification circuit…, said fuel overinjection notification circuit issuing a notification that excessive fuel is being supplied to said engine of said vehicle*." Thus, the limitation is not indefinite. Velocity's expert, Mr. Nranian, readily understands the meaning of this term. (Nran. Decl. at ¶¶ 48-49.) Defendants' expert, Dr. Wilhelm, was perfectly capable of understanding the description of the preferred embodiment of the limitation in the specification, despite his repeated claims that he had no idea what the limitation meant. (Ex. 20 at 81:3-82:9) Moreover, the USPTO and Defendants themselves have had no difficulty understanding the limitation in the past. Indeed, Defendants understood the limitation when they applied prior art to it in their unsuccessful attempt to invalidate the claims before the USPTO. In fact, the limitation was before the USPTO three times, in an *ex parte* reexamination and two separate *inter partes* review proceedings, and the USPTO never raised any concerns about its ability to determine the scope of the limitation. (*See* Velocity's Claim Construction Brief at 10-11.)

Defendants' indefiniteness analysis is fundamentally flawed because they focus on only two words of the limitation, "excessive fuel," construing them in isolation and out of context of the full limitation and the overall claim. By ignoring surrounding claim language, Defendants mischaracterize the limitation. (*See id.* at § IV.B.2.) This limitation does *not* address whether the amount of fuel being supplied is excessive or not, but instead only requires "a *notification* that excessive fuel is being supplied." (*Id.*) Because Defendants' indefiniteness argument ignores the majority of the words in the limitation and attempts to read new requirements into the claim, Defendants' motion for summary judgment of indefiniteness should be denied.

Velocity's expert, Mr. Nranian, has submitted that the fuel overinjection notification limitation is clear and he understands the limitation to mean "a circuit that notifies a driver of a reduced fuel economy condition at the time of the condition." (Nran. Decl. at ¶¶ 48-49.) While Defendants' expert submitted a declaration stating that he does not understand what "excessive fuel" means, his declaration suffers from the same faults as Defendants' brief, and he ignores the majority of the claim language at issue. Moreover, as explained in detail below, Dr. Wilhelm was unfamiliar with the contents of his declaration, and the Court should not give Dr. Wilhelm's declaration any weight in deciding these motions. For these reasons and those described in Velocity's Claim Construction Brief, Defendants' motion for summary judgment of indefiniteness should be denied.

## IV. THE ACCUSED VEHICLES INFRINGE THE FUEL OVERINJECTION NOTIFICATION CIRCUIT UNDER VELOCITY'S CONSTRUCTION

Even though discovery is at an early stage in this case, the evidence already in the record demonstrates that the accused vehicles practice the fuel overinjection notification limitation under all proposed constructions. As explained in detail below, the accused vehicles each include one or more display circuits that "notif[y] a driver of a reduced fuel economy condition at the time of the condition," and thus infringe under Velocity's construction.

In fact, the accused circuits infringe under *any* construction that is consistent with the intrinsic record of the '781 patent because they have the same purpose and perform the same operation as the preferred embodiment of the claimed fuel overinjection notification circuit. (Nran. Decl. at ¶¶ 100-102; Ex. 1 at 13:2-20, cl. 41-45.) The experts for both Velocity and Defendants agree that the preferred embodiment of the fuel overinjection notification circuit is a circuit that notifies a driver that fuel economy can be increased if he/she reduces the amount of fuel supplied to the engine, for example, by modifying the way he/she is using the gas pedal. (Nran. Decl. at ¶ 100; Ex. 20 at 81:3-82:9.) Or as Defendants' expert testified, the preferred embodiment is a circuit that tells a driver to "take their foot off the gas." (Ex. 20 at 81:3-82:9.) The experts also both agree that the accused display circuits and gauges perform the same operation of notifying a driver that he/she should take her foot off the gas to increase fuel

economy.  (Nran. Decl. at ¶ 102; Ex. 20 at 166:18-167:11, 175:23-178:1.)  Or as Defendants'
expert testified, the accused displays and gauges tell a driver to "not step too hard on the gas."
(Ex. 20 at 167:6-11.)

The accused vehicles also infringe under Defendants' alternative construction of the fuel
overinjection notification circuit limitation.  According to Dr. Wilhelm, this "alternative"
construction (replacing the phrase "excessive fuel" with "more fuel than is proper") is a "plain
and ordinary meaning" construction that encompasses a light indicating a fuel system
malfunction that he referred to as an engine flooding condition caused by the fuel mixture being
too rich.  (Ex. 20 at 38:15-18, 40:2-41:4-8, 42:2-43:23.)  In fact, he testified that the only
situation that he could think of when "more fuel than is proper" is supplied to an engine is the
fuel system malfunction of engine flooding.  (*Id.* at 43:15-44:10.)  But as Defendants admit in
their motion, any construction encompassing a notification of an engine malfunction "runs
directly counter to the '781 patent." (D.E. 105 at 16, D.E. 106 at 73.)  Velocity agrees.
Defendants' alternative construction, as explained by Dr. Wilhelm, is inconsistent with the
intrinsic record and should be rejected.  (Nran. Decl. at ¶¶ 103-104.)  But even if the Court were
to adopt Defendants' alternative construction, the accused products still infringe.  The accused
vehicles provide malfunction lights indicating to drivers that a fuel system malfunction has
occurred due to flooding.  (*Id.*)

Without any non-infringement argument that has merit, Defendants base their motion on
arguments that the accused display circuits: (1) fail to display "a notification about the ***actual***
amount of fuel being supplied to the engine"; (2) "do not provide any notification to the driver
about the amount of fuel being supplied to the engine—let alone that an amount of fuel is, at any
particular time, ***excessive***"; and (3) "do not provide any notification that 'excessive fuel' is being
supplied to the engine. (D.E. 105 at 7, 9, 10, 13, 14.) (emphasis in original.)  While these
arguments are somewhat ambiguous, it appears that Defendants are trying to import new
limitations into the claims. But none of the proposed constructions of the fuel overinjection
circuit, neither Velocity's nor Defendants', require displaying an "amount of fuel supply" or a

message that includes the phrase "excessive fuel." Nevertheless, the evidence in the record, much of which the Defendants mischaracterize and ignore, shows that the display circuits do in fact indicate to a driver that "excessive fuel is being supplied to the engine" as claimed, and that "a reduced fuel economy condition" has occurred, as construed. (Nran. Decl. at ¶ 103.)

### A.    FCA ECO Index Gauge

- Gas Pedal Percentage Gauge: This gauge shows what percent the gas pedal is currently depressed at.
- Turbo Gauge: This gauge shows the current turbo usage.
- ECO Index Gauge: The ECO Index gauge allows the driver to monitor their driving style in order to increase fuel economy. The efficiency of the driving style is displayed on a gauge located on the right side of the instrument cluster and ranges from a minimum value of 0 up to a maximum value of 5 (0 = low, 5 = high). A higher "ECO" index indicates a

more fuel efficient drive style and will increase your fuel economy. A lower "ECO" index indicates frequent accelerations/decelerations and will decrease your fuel economy. The index is recalculated approximately every second and takes into account a combination of the instant fuel economy and your driving style during the current trip.

(*See, e.g.*, Ex. 13, 2015 Fiat 500 Owner's Manual at 155; Nran. Decl. at ¶¶ 113-114.)

The ECO Index Gauge infringes the fuel overinjection notification circuit under Velocity's construction because a lower 'ECO' index displayed while driving "notifies a driver of a reduced fuel economy condition at the time of the condition." (Nran. Decl. at ¶¶ 113-114.) The ECO Index Gauge shows a numerical index that "allows the driver to monitor their driving style in order to increase fuel economy… A higher 'ECO' index indicates a more ***fuel efficient drive style*** and will increase your fuel economy. A lower 'ECO' index indicates frequent ***accelerations/decelerations*** and will decrease your fuel economy." (*Id.*) (emphasis added.) According to the manuals, "fuel efficient driver style" relates to the amount of fuel supplied to the engine based on how the driver accelerates/decelerates (i.e., how the driver operates the gas pedal.) (*Id.*) The index is recalculated approximately every second and takes into account a combination of instant fuel economy and driving style during the current trip. (*Id.*) Defendants and Dr. Wilhelm completely ignored the FCA ECO Index Gauge including evidence confirming

that "driving style" encompasses the manner in which a driver accelerates/decelerates (*i.e.*, operates the gas pedal).[4]

### B.     The FCA ECO Display

**ECO**
- The ECO message will appear in your EVIC display whenever you are driving in a fuel efficient manner.
- This feature allows you to monitor when you are driving in a fuel efficient manner, and it can be used to modify driving habits in order to increase fuel economy.

(*See, e.g.*, Ex. 14, 2014 Dodge Challenger User Guide at 71; Nran. Decl. at ¶¶ 115-117.)

The FCA ECO message displayed by the EVIC circuit infringes the fuel overinjection notification circuit under Velocity's construction. (Nran. Decl. at ¶¶ 115-117.)   The message is displayed "whenever you are driving in a fuel efficient manner."  (*Id*.)  The absence of the ECO light while driving indicates that the driver is not driving in a fuel efficient manner and thus it "notifies a driver of a reduced fuel economy condition at the time of the condition."  (*Id*.)  The manuals also explain the purpose of the ECO message: to allow the driver to monitor fuel economy while driving so that the driver can modify driving style to increase fuel economy (e.g., modify the amount of fuel supplied to the engine by changing the way the driver is using the gas pedal).  (*Id*. at ¶ 116.)  Dr. Wilhelm appears to agree. (Ex. 20 at 166:18-167:11.)   When presenting the evidence concerning the FCA ECO message in their brief and declaration, respectively, Dr. Wilhelm and Defendants omitted the highly relevant second bullet point (shown above) relating to modifying driving style.  (D.E. 105 at 10; D.E. 106 at 59.)

### C.     The FCA Fuel Saver Mode Display

---

[4] Dr. Wilhelm confirmed that he reviewed evidence about the FCA Fuel ECO Index Gauge, and that did not render an opinion on or address this evidence.  (Ex. 20 at 178:2-179:20.)



- The FUEL SAVER MODE message will display above the average fuel economy in the EVIC display. This message will appear whenever the Multi-Displacement System (MDS) (if equipped) allows the engine to operate on four cylinders, or if you are driving in a fuel efficient manner.

(*See, e.g.*, Ex. 15, 2014 Dodge Challenger Owner's Manual at 223-24; Nran. Decl. at ¶¶ 115-117.)

The FCA Fuel Saver Mode message displayed by the EVIC circuit infringes the fuel overinjection notification circuit under Velocity's construction. (Nran. Decl. at ¶¶ 115-117.) The message is displayed whenever the car engine is running on four cylinders (instead of eight) and it is displayed when "you are driving in a fuel efficient manner." (*Id.*) The absence of the message while driving indicates that the driver is not driving in a fuel efficient manner and thus it "notifies a driver of a reduced fuel economy condition at the time of the condition." (*Id.*) Similar to the ECO message, the purpose of the Fuel Saver Mode message is to allow the driver to monitor fuel economy while driving so that the driver can modify driving style to increase fuel economy (e.g., change the way the driver is using the gas pedal in order to reduce the fuel supplied to the engine). (*Id.* at ¶ 116.) When presenting the evidence concerning the Fuel Saver Mode message in their brief and declaration, respectively, Dr. Wilhelm and Defendants omitted the portion of the text (shown above) relating to monitoring driving style and modifying habits to increase fuel economy. (D.E. 105 at 9-10; D.E. 106. at 56-60.)

### D. The FCA Instantaneous MPG v. Average MPG Displays



and average fuel economy, according to the current fuel tank level. DTE cannot be reset through the SELECT button.

**NOTE:** Significant changes in driving style or vehicle loading will greatly affect the actual drivable distance of the vehicle, regardless of the DTE displayed value.

When the DTE value is less than 30 miles (48 km) estimated driving distance, the DTE display will change to a "LOW FUEL" message. This display will continue until the vehicle runs out of fuel. Adding a significant amount of fuel to the vehicle will turn off the "LOW FUEL" message and a new DTE value will display.

**Fuel Economy**

**Distance To Empty (DTE)**

Shows the estimated distance that can be traveled with the fuel remaining in the tank. This estimated distance is determined by a weighted average of the instantaneous

**Miles Per Gallon (MPG)**

This display shows the instantaneous MPG in bar graph form while driving. This will monitor the gas mileage in real-time as you drive and can be used to modify driving habits in order to increase fuel economy.

(*See, e.g.*, Ex. 16, 2014 Journey Owner's Manual Guide at 317; Nran. Decl. at ¶¶ 118-120.)

**Fuel Economy**

Push and release the UP or DOWN arrow button until the Fuel Economy Menu item is highlighted in the DID.

- Two sub menu pages one with Current value displayed and one without the Current Value displayed:
  – Current MPG (or L/100 km)
  – Range (miles or km)
  – Average MPG (or L/100 km)
  – The Max and Min values will correspond to the particular engine requirements

- Lower end of gauge will be displayed in an amber color and turn green as Fuel Economy improves.
- MPG will have the gauge fill from the left (clockwise).
- L/100 km will have the gauge fill from the right (counter clockwise).
- Hold **OK** to reset average fuel economy information.



(*See, e.g.*, Ex. 17, 2015 Dodge Challenger Owner's Manual at 255-256; CHRY VEL0073676; Nran. Decl. at ¶¶ 121-122.)

The FCA Instantaneous MPG v. Average MPG Displays (Bar Graph Displays and Dynamic Information Displays, shown above) infringe the fuel overinjection notification circuit

under Velocity's construction. (Nran. Decl. at ¶¶ 118-122.) The FCA Bar Graph Display shows the average MPG and the instantaneous MPG in real-time. Whenever the instantaneous MPG falls below the average MPG the display "notifies a driver of a reduced fuel economy condition at the time of the condition." (*Id*. at ¶ 119.) Dr. Wilhelm appears to agree. (Ex. 20 at 175:23-178:1.)

The Dynamic Information Display includes a gauge that turns green as fuel economy improves and turns amber otherwise. When amber, the gauge "notifies a driver of a reduced fuel economy condition at the time of the condition." (Nran. Decl. at ¶ 121.) The Dynamic Information Display also displays the current (instantaneous) MPG, average MPG, and an average fuel economy indicator. (*Id*.) The purpose of these displays is to allow the driver to monitor gas mileage in real-time so that the driver can modify driving behavior to increase fuel economy (e.g., modify the amount of fuel supplied to the engine by changing the way the driver is using the gas pedal.) (*Id*. at ¶ 122.) Both the Bar Graph and Dynamic Information Displays indicate the amount of fuel consumption because they show the instantaneous MPG. (*Id*. at ¶¶ 120, 122.) Dr. Wilhelm agrees that instantaneous MPG relates to the amount of fuel supplied. (Ex. 20 at 165:1-7.)

When presenting the evidence concerning these displays in their brief and declaration, respectively, Dr. Wilhelm and Defendants omitted ***all*** of the text pertaining to the bar graph display (shown above) including the text relating to monitoring driving style and modifying habits to increase fuel economy. (*See* D.E.105 at 12-13; D.E. 106 at 63-65.) They also omitted ***all*** of the text information describing the amber/green notification relating to the Dynamic Information Display. (*Id*.)

### E. The Mercedes ECO Display





(*See, e.g.*, Ex. 11, Mercedes-Benz 2014 S-Class Operator's Manual at 195; Ex. 12, Mercedes-Benz GLE Coupe Operator's Manual at 161; Nran. Decl. at ¶¶ 105-106.)

The Mercedes ECO Display infringes the fuel overinjection notification circuit under Velocity's construction because it "notifies a driver of a reduced fuel economy condition at the time of the condition." (Nran. Decl. at ¶¶ 105-106.) Mercedes has implemented two different versions of their ECO display in the accused products (pictured above), and both versions of the display are accused to infringe. The manuals for the Mercedes products at issue explain that the Mercedes ECO display "provides feedback on how economical" a driver's operation is, enabling the user to "significantly influence the vehicle's consumption." (*Id*.; Ex. 11 at 195; Ex. 12 at 161.) Accordingly, these displays allow the driver to achieve "the most economical driving style" possible, thereby avoiding "reduced fuel economy conditions" as required by Velocity's proposed construction for this term. (*Id*.; Ex. 11 at 195; Ex. 12 at 161.)

For example, the ECO display pictured on the right above conveys to the driver "how economical" his driving is with respect to three factors: acceleration, coasting, and constant speed. (Ex. 12 at 161.) When driving economically, the bars corresponding to each factor ("outer area") fill up and an icon corresponding to that factor ("inner area") is illuminated green. (*Id.*) When any of the three measures of driving style do not indicate an economical driving

style, the outer bars will empty and the corresponding icon will cease to be illuminated, thereby conveying to the driver that his fuel economy has been reduced. (*Id.*) This display also includes an "additional range achieved" value, indicating "additional range achieved since the beginning of the journey as a result of an adapted driving style. (*Id.*) Accordingly, when this "additional range" begins to reduce, the driver is similarly notified that he/she is driving less economically than he was previously driving.

As an additional example, the ECO display pictured on the left above displays three bars and the displayed percentage value start with a "mean value of 50%," and "a higher percentage indicates a more economical driving style." (Ex. 11 at 195.) Accordingly, when a driver operates the vehicle in a way that negatively impacts fuel economy, such as extreme or "sporty" acceleration, the corresponding "Accel." bar will empty below 50% (the starting value) and the displayed numerical value will likewise be reduced. (*Id.*) Seeing the ECO display numerical value and any of the acceleration, constant, or coasting bars decrease notifies the driver that his driving style has become less economical. (*See* Nran. Decl. at ¶ 105.) In other words, his driving has resulted in a "reduced fuel economy condition."

**F.    The Mercedes MPG and Range Display**





① Distance
② Duration
③ Average fuel consumption
④ Average speed

The approximate range that can be covered depends on the fuel level and your current driving style. If there is only a small amount of fuel left in the fuel tank, the display shows a vehicle being refueled 🚗 instead of the range.

13

(*See, e.g.*, Ex. 11 at 251-52; Ex. 12 at 222-23; Nran. Decl. at ¶¶ 108-109.)

The Mercedes range and current fuel consumption display infringes the fuel overinjection notification circuit under Velocity's construction because it "notifies a driver of a reduced fuel economy condition at the time of the condition." (Nran. Decl. at ¶¶ 108-109.) This straightforward display conveys "the approximate range that can be covered," which is dependent on "the fuel level and your current driving style." (Ex. 11 at 251-52.) This display also conveys to the driver the "current fuel consumption" in miles per gallon ("mpg"). (*Id.*) The only reasonable interpretation of this evidence is that it conveys information to the driver regarding the current fuel economy. (Nran. Decl. at ¶ 109.)

For example, similar to FCA MPG displays discussed above, the "Consumption mpg" indicator indicates a reduced fuel economy condition to the driver when the display indicates a current miles per gallon value that is lower than the average miles per gallon noted in the trip computer display. (Nran. Decl. at ¶¶ 108-109.) As an additional example, when the range currently displayed to the driver is quickly reduced, the driver is notified that his driving style has resulted in a "reduced fuel economy condition" – i.e., the vehicle can travel a shorter distance with the current fuel than previously estimated. Furthermore, when the "Consumption mpg" indicator is reduced, the driver is notified that his driving style has resulted in a "reduced fuel economy condition" – i.e., the vehicle can cover a shorter distance per gallon of fuel used.

## V. THE ACCUSED VEHICLES INFRINGE UNDER ANY CONSTRUCTION THAT IS CONSISTENT WITH THE INTRINSIC EVIDENCE AND ENCOMPASSES THE PREFERRED EMBODIMENT

All of the accused display circuits and gauges described above infringe under any construction that is consistent with the intrinsic record. The display circuits have the same purpose and perform the same operation as the preferred embodiment of the claimed fuel overinjection notification circuit. (Nran. Decl. at ¶ 100.) In particular, the preferred embodiment of the fuel overinjection notification circuit notifies the driver that in order to optimize fuel economy "the amount of fuel being supplied to the engine should be reduced." (*Id.*; Ex. 1 at col. 13:2-20, 13:41-45.) Defendants' expert agrees that "the first thing that comes to mind" when

14

reading the description of the preferred embodiment of the fuel overinjection notification circuit is "tak[ing] your foot off the gas" to reduce the fuel supply to the engine. (Ex. 20, at 81:3-83:14.) As shown above, the accused display devices and gauges have the same purpose and perform the same operation: alerting the driver that he/she is operating a vehicle in an inefficient manner so that he/she can modify her driving style (e.g., modify how he/she accelerates/operates the gas pedal). (Nran. Decl. at ¶¶ 101-102.) Defendants' expert, Dr. Wilhelm, appears to agree. As previously mentioned, he testified that the various accused displays notify a driver that he/she can increase fuel economy by modifying the way he/she is using the gas pedal (i.e., by changing the amount of fuel supplied to the engine.) (Ex. 20 at 166:18-167:11, 175:23-178:1.) Because the accused display circuits and gauges practice the preferred embodiment, they infringe under any construction that encompasses the preferred embodiment.

## VI. THE ACCUSED VEHICLES INFRINGE UNDER DEFENDANTS' ALTERNATIVE CONSTRUCTION

Both Velocity and this Court have the difficult task of making sense of Defendants' claim construction and the test Defendants applied to determine whether the accused products infringe. In their brief, Defendants propose a construction that replaces the alleged indefinite term of degree ("excess fuel") with another term of degree ("more fuel than is proper"). (D.E. 105 at 13.) But for the most part, they appear to be testing for infringement by determining if the accused products provide an indication of "excessive fuel" rather than applying their proposed construction. (*See, e.g.,* D.E. 106 at 54, 55, 56, 60, 61, 66, 68.) Additionally, Defendants and their expert refer to their construction as the "plain language" of the fuel overinjection notification circuit. (D.E. 105 at 6.) But Defendants' cannot have it both ways. Either they construe the claim and apply the construction in their infringement analysis or they do not construe the claim, and apply the plain and ordinary meaning of the claim. These concepts are mutually exclusive and by conflating the analysis, Defendants create a confusing moving target.

For this reason alone, the Court should deny Defendants' motion for summary judgment. Defendants' should not be allowed to apply their "plain language" interpretation of the claims in

a situation where both Defendants and Velocity have told the Court that a construction is necessary and have expended resources to construe the claims in the claim construction briefing. Moreover, Defendants appear to be making non-infringement arguments relating to requirements that are not within the scope of any claim language or any proposed construction (e.g., a requirement to display an actual amount of fuel supply.) (D.E. 106 at 54; Ex. 20 at 115:6-11.)

As described in detail below, when Velocity sought clarification from Defendants' expert, Dr. Wilhelm, he struggled to explain the meaning of Defendants' "plain language" alternative construction and ultimately testified to an interpretation that is inconsistent with the '781 patent and directly contradicts the contents of his declaration.   When asked to explain the non-infringement opinions in the declaration and the infringement test applied, Dr. Wilhelm was evasive and ultimately testified that he applied ***Velocity's proposed construction*** (which is clearly incorrect). (Ex. 20 at 121:18-122:7.) When pressed further, Dr. Wilhelm testified that, in order to infringe, a display needs to show the "actual fuel consumption" and the display or corresponding manual would need to indicate "excessive fuel" or some similar phrase that he was unable to define because "I don't understand what fuel overinjection means, I don't understand ['excessive fuel'] either." (Ex. 20 at 115:6-11, 119:3-120:21.) These facts raise serious doubts as to the credibility of Dr. Wilhelm's declaration, and his ability to opine on issues relating to infringement and indefiniteness.   Yet despite all of this confusion, and the mischaracterizations of the record discussed below, the evidence in the record still supports infringement under Defendants' "plain language" alternative construction.

### A.      Defendants' Expert, Dr. Wilhelm, Is Unfamiliar With The Opinions In His Declaration

Defendants' expert, Dr. Wilhelm, submitted a declaration in support of Defendants' motion. (D.E. 106.) He spent 28 years working for an automotive manufacturer and its wholly owned subsidiaries before starting a consulting firm. (D.E. 106, Ex. B; Ex. 20, at 22:10-22:21.) As a consultant, he spends 80-85% of his time serving as an expert witness for patent litigation matters. (Ex. 20 at 25:14-17.) His expert witness work consists of 12 patent litigation matters since 2013, all relating to the auto industry. (D.E. 106, Ex. B; Ex. 20 at 26:3-6.) He has never

been adverse to an auto manufacturer in a patent litigation. (Ex. 20 at 30:21-31:1.)  On January 14, 2016, Velocity deposed Dr. Wilhelm.  He testified that he wrote only 20-30% of his declaration.  (*Id.* at 10:19-11:5.)  The portions he wrote are limited to the state of the art, his qualifications, and definition of a person of ordinary skill in the art.  (*Id.* at 11:9-11:22, 13:20-14:5.)  He did not know who wrote the remaining 70-80% of the declaration.  (*Id*. at 12:1-22.)

Dr. Wilhelm spent five hours preparing for his deposition with counsel the day before the deposition took place and his declaration is only 25 pages long.  (*Id.* at 16:18-25.)  Yet during his deposition, despite taking additional time to review the declaration on the record, Dr. Wilhelm seemed to have limited knowledge of the contents of the declaration or the stated opinions.[5] For example, counsel for Velocity walked Dr. Wilhelm through the summary of opinions listed in paragraph 3 of the declaration, including the opinion on "whether Defendants' accused vehicles infringe any Asserted Claims."  (D.E. 106 at 3; Ex. 20, at 34:7-24.)  Dr. Wilhelm was asked repeatedly about the non-infringement opinion presented in the declaration.  (Ex. 20 at 35:15-38:23.)  In direct contradiction to what is stated in the declaration, Dr. Wilhelm testified that he did ***not*** render any opinion on non-infringement because "I don't know how to apply that to the vehicles in question." (*Id.* at 36:13-37:17, 38:19-23.)  He testified that it was "impossible" to render an opinion on non-infringement because, in his view, the claims are indefinite.  (*Id.* at 37:8-25.)  Apparently, Dr. Wilhelm was unaware that more than 50% of the declaration (pages 13-25) was dedicated to an opinion on non-infringement under Defendants' proposed construction.  (*Id.* at 37:8-25.)  Dr. Wilhelm later testified that during his lunch break, Defendants' counsel explained to him "what I had messed up" and instructed him to ***read*** the declaration.  (*Id.* at 129:2-14.)

As another example, Dr. Wilhelm was apparently unaware that his testimony explaining his understanding of Defendants' alternative construction is inconsistent with the opinions

---

[5] Paragraphs 50-75 of Dr. Wilhelm's declaration (D.E. 106) appear to be verbatim copies of the text (and footnotes 6-8) on pages 7-14 of Defendant's Memorandum (D.E. 105).

drafted by an unknown attorney in the declaration.  At his deposition, Dr. Wilhelm was asked to explain why the phrase "more fuel than is proper" in Defendant's alternative construction was any less a term of degree than the claim language "excessive fuel."  He then responded that, while "more fuel than is proper" might be a term of degree, the alternative construction was more understandable to him as referring to a situation where the fuel injected to the engine was far "too rich."  (*Id.* at 39:17-41:8.)  The only example he could think of for when the fuel injected to the engine would be "too rich" is when a malfunction occurred and the engine is flooded.  (*Id.* at 43:15-44:10.)  He explained Defendants' construction of the phrase "more fuel than is proper" with reference to an example of a fuel system malfunction that results in activating a malfunction light.   (*Id.*  at  40:2-22,  41:4-8,  42:2-43:23.)   Dr.  Wilhelm  also  testified  that  a  flooding malfunction  would  cause  a  car  to  stop  running,  requiring  the  driver  to  get  "help  from  a technician" to start the car.  (*Id*. at 42:2-7.)  In direct contrast, the opinion expressed in the declaration criticized any claim interpretation that encompasses malfunctions and activating a malfunction light. (D.E. 106 at 73.)  According to the declaration, Dr. Wilhelm's explanation of what Defendants' alternative construction means "runs directly counter to the '781 patent."  (*Id*.) In fact, the declaration expressly distinguishes the claims of the '781 patent from malfunctions that require "taking the vehicle to a mechanic to be diagnosed and serviced."  (*Id*.)  Given his lack  of  knowledge  concerning  the  content  of  the  declaration,  and  the  blatant  inconsistencies between Dr. Wilhelm's testimony and the contents of the declaration, the declaration should be given no weight. Accordingly, Defendants' motion, which relies heavily on the declaration and alleged expert testimony, should be denied on all grounds.

### B.    Defendants Mischaracterize The Record

Defendants  rely  on  mischaracterizations  of  facts,  misleading  statements,  and  an incomplete presentation of evidence in their motion.    For example, as explained above, the evidence relied on by Defendants and Dr. Wilhelm for each of the accused displays and gauges is misleading and incomplete.   First, Defendants and Dr. Wilhelm completely ignored evidence regarding the FCA ECO Index Gauge including evidence that explains that gauge is intended to

modify "driving style" such as manner in which a driver accelerates/decelerates (*i.e.*, operates the gas pedal and thereby adjusts the fuel supplied to the engine).[6]  Second, the evidence from vehicle manuals included in Defendants' memorandum and Dr. Wilhelm's declaration is incomplete. Highly relevant evidence that describes the purpose and use of the accused gauges and displays (e.g., descriptions including, that the messages displayed "can be used to modify driving habits in order to increase fuel economy") was omitted from the manual snapshots and discussion for various accused FCA gauges and displays.  (*See*, *e.g.*, D.E. 105 at Figures 2-3, 5-6 and related discussion, omitting portions of the descriptions from the cited FCA manuals, including entire manual points, shown above in complete form; D.E. 105 at Figure 1 and related discussion, omitting portions of the descriptions from the cited Mercedes manuals, including statement that "driving style can significantly influence the vehicle's consumption.")  Finally, Defendants redacted portions of Velocity's infringement contentions against FCA in their filings accompanying their motion for summary judgment, and as a result, this Court does not have the full record of evidence before it.  (*See, e.g.*, Def.'s Exs. G-1, G-2).

As another example, Defendants open their brief by arguing that the "fuel overinjection [notification] circuit ***was added to all claims only recently, after this litigation was filed***, in an attempt to salvage the patent during a U.S. Patent & Trademark Office reexamination proceeding."  (D.E. 105 at 1.)  But the fact is, this limitation was included in all of the asserted original independent claims that were allowed in 1999.  (*See, e.g.,* Ex. 1 at cl. 1, 7, 13, 17, 23, 26.)  Contrary to Defendants' mischaracterization, the patentability of these original claims was reconfirmed during reexamination in 2015 without any amendments.  (Ex. 4.)

Defendants argue that "[t]he patent provides ***scant disclosure***, however, as to what this [limitation] might mean" and that there is "no support in the intrinsic evidence" to support Velocity's construction of the term.  (D.E. 105 at 1, 6.)  However, Velocity's construction comes

---

[6] Dr. Wilhelm confirmed that he reviewed evidence about the FCA Fuel ECO Index Gauge, and that did not render an opinion on this gauge.  (Ex. 20 at 178:2-179:20.)  Velocity believes that infringement of this accused gauge is outside the scope of Defendants' pending motion.

from highly relevant excerpts of the '781 patent specification that clearly describes the purpose and operation of the preferred embodiment of the limitation. (*See e.g.,* Ex. 1 at 1:11-2:26, 13:2-20, 13:37-45.) Defendants simply ignore these excerpts when making their arguments.

Defendants also argue that Velocity waived its right to allege infringement under the doctrine of equivalents because the "case has been pending for over two years" and Velocity did not include doctrine of equivalents arguments in its recent supplemental contentions. (D.E. 105 at 17-18.) But Velocity's supplemental contentions are ***preliminary*** contentions that were provided to incorporate new vehicle models and new claims that only became available recently after reexamination of the patent was complete. As there is currently no schedule in the case for contentions, Velocity provided these contentions voluntarily as a courtesy. Defendants' implied accusation of waiver due to delay is disingenuous, especially because it was Mercedes and other Defendants that obtained a stay of the litigation in order to pursue a reexamination and two *inter parte* reviews, all filed after the litigation commenced.[7]

### C.  Defendants' Application of Their Alternative Construction to the Accused Products Imports New Limitations Not Found In Any Parties' Construction.

To the extent that it can be comprehended, the infringement test applied by Defendants' in their motion is improper. None of the proposed constructions for the fuel overinjection notification circuit requires any express display of an amount of fuel consumption or any particular phrase like "excessive fuel." Defendants' alternative construction is "a fuel overinjection notification circuit …issuing a notification that more fuel than is proper is being supplied to the engine of said vehicle." Velocity's construction is "a circuit that notifies a driver of a reduced fuel economy condition at the time of the condition." Both constructions require only that the circuit issues a notification ***about*** fuel supply (Defendants) or reduced fuel economy conditions (Velocity). The exact information or phrase displayed or sounded by the notification

---

[7] Defendants also attempt to manufacture confusion about the scope of Velocity's infringement contentions. (D.E. 105 n.5.) The contentions are clear. If Defendants were truly confused, they could have sent an email or made a phone call requesting clarification.

is not specified in the proposed constructions. And there is nothing in the intrinsic evidence that would support a construction that limits the notification to any specific phrase like "excessive fuel" or specific value like the actual amount of fuel supplied. In fact, Dr. Wilhelm admitted that there is nothing in the '781 patent describing a measurement of the actual amount of fuel being supplied to the engine. (Ex. 20 at 50:17-23.) Thus, an infringement test that requires display of something that is not even measured in the context of the patent must be rejected.

In any event, the existing evidence in the record shows that at least the accused Mercedes MPG and range displays and FCA instantaneous MPG displays do indicate the amount of fuel supplied to the engine and indicate "actual fuel consumption" as Defendants argue the claims require. (Nran. Decl. at ¶¶ 110, 120, 122.) Moreover, Dr. Wilhelm admitted that the instantaneous MPG display indicates the actual amount of fuel supply. (Ex. 20 at 165:1-7.) And it is common sense that the instantaneous/current MPG displayed by circuits in the accused vehicles is a function of the amount of fuel supplied to the engine. Thus, while there is evidence that the displays indicate the amount of fuel supplied to the engine, there is ***no evidence*** in the record supporting Defendants' position that the accused MPG and range displays do not indicate the amount of fuel being supplied to the engine. Dr. Wilhelm admitted that he did not investigate what algorithms the Defendants are using to trigger any of the accused displays and thus he cannot opine on whether the displays shown in the accused vehicles represent an actual fuel amount. (Ex. 20 at 149:12-150:13, 151:2-14, 152:20-153:10; 174:5-13.)

### D. The Accused Vehicles Include a Malfunction Light That Infringes Under Defendants' Alternative Construction.

According to Defendants' expert, Defendants' alternative construction of the fuel overinjection notification circuit encompasses a malfunction light that turns on when a fuel system malfunction of flooding occurs. (Ex. 20 at at 38:15-44:10.) Velocity disagrees. (Nran. Decl. at ¶ 123.) However, to the extent that the Court adopts Defendants' alternative construction, the evidence in the record shows that the accused vehicles infringe. All of the accused vehicles have malfunction lights that indicate to the driver that there is an engine malfunction. There is evidence in the record that each of the accused vehicles trigger the

21

malfunction light when there is a fuel system malfunction including a flooding malfunction when the fuel mixture is too rich.  (*Id*.)   There is no evidence in the record to the contrary.

### 1.    The FCA Fuel System Malfunction Lights Infringe Under Defendants' Construction

> **9. Malfunction Indicator Light (MIL)**
>
> The Malfunction Indicator Light (MIL) is part of an Onboard Diagnostic system, called OBD, that monitors engine and automatic transmission control systems. The light will illuminate when the key is in the ON/RUN position, before engine start. If the bulb does not come on when turning the key from OFF to ON/RUN, have the condition checked promptly.
>
> Certain conditions, such as poor fuel quality, etc., may illuminate the MIL after engine start. The vehicle should be serviced if the light stays on through several of your typical driving cycles. In most situations, the vehicle will drive normally and will not require towing.

(*See, e.g.*, Ex. 18, 2014 Dodge Charger Owner's Manual at 323; Nran. Decl. at ¶ 124.)

The FCA Malfunction Indicator Lights (MIL) infringe the fuel overinjection notification circuit under Defendants' alternative construction because they notify a driver that there is an engine malfunction such as a fuel system malfunction (*Id*. at ¶¶ 123-124.) The Onboard Diagnostic System (OBD) monitors the engine and illuminates the MIL if various conditions occur, including a poor fuel quality condition. (*Id*. at ¶ 124.)   The poor fuel quality condition referred to in the FCA manuals appears to correspond to the too rich fuel mixture identified by Dr. Wilhelm as an example of "more fuel than is proper is being supplied to the engine." (Defendants' alternative construction).  (*Id*.)  Like the condition that Dr. Wilhelm described, the manuals also explain that if the MIL stays on through several driving cycles, the vehicle should be serviced.  (*Id*. at ¶ 124.)

### 2.    The Mercedes Fuel System Malfunction Lights Infringe Under Defendants' Construction



(*See, e.g.*, Ex. 11 at 308; Nran. Decl. at ¶ 125.)

The yellow Check Engine warning lamp in the accused Mercedes vehicles satisfy the fuel overinjection notification circuit under Defendants' alternative construction because it notifies the driver of a malfunction, such as a malfunction in the fuel injection system or fuel system. (Nran. Decl. at ¶¶ 123, 125.) Malfunctions in the fuel injection system may include, for example, those that affect the relative proportions of fuel and air that are supplied to the engine, resulting in a mixture that is too fuel-rich. (*Id*. at ¶ 125.) As noted above, according to Defendants' own expert, this sort of malfunction is precisely what is encompassed by Defendants' construction requiring that "more fuel than is proper is being supplied to the engine."

## VII. VELOCITY HAS NOT WAIVED ANY ARGUMENT THAT THE ACCUSED VEHICLES INFRINGE UNDER THE DOCTRINE OF EQUIVALENTS.

As an initial matter, the issue of whether the accused products infringe the asserted claims under the doctrine of equivalents ("DOE") is not before the Court and premature. Velocity is not currently asserting infringement under the DOE. If the Court should adopt a construction for any terms that differs from the construction Velocity has proffered, Velocity may amend its infringement contention theories to account for the meaning of the claims as ruled by the Court as allowed for under LPR 3.1 and 3.4. Defendants' argument that Velocity has waived the right to further amend its infringement contention theories at this early stage of the case – before claim construction is complete, before serving final infringement contentions, and before discovery is complete – is without merit. (D.E. 105 at 17-18.)

At the very least, should the Court adopt a construction that is different than Velocity's proposed construction, Velocity should have the opportunity to pursue discovery that may be applicable to a DOE theory. No such discovery has been sought yet. Indeed, document productions are not complete, no expert reports have been submitted, and no witnesses been deposed, with the exception of Dr. Wilhelm. In fact, the case schedule was vacated and discovery ceased at Mercedes' request in 2014 when the case was stayed pending resolution of

Defendants' IPR. (D.E. 74.)  Accordingly, Defendants' argument that Velocity waived any DOE arguments because "[t]his case has been pending for over two years" is disingenuous at best.

Defendants' argument that Velocity may not amend its *initial* infringement contentions in the future is perplexing because the Local Patent Rules clearly allow for amendments even to *final* contentions if warranted by a Court's claim construction ruling.  *See* LPR 3.4; *In re Innovatio IP Ventures, LLC Patent Litig.*, 956 F. Supp. 2d 925, 941 (N.D. Ill. 2013) (noting it was inappropriate to hold a party to positions in final contentions before claim construction was complete).  Defendants' argument that Velocity may not amend its initial *or* final infringement contentions (not yet scheduled) is clearly contrary to the rules and practice in this Court.

Velocity has diligently provided up-to-date contentions when appropriate, and will continue to do so after this Court issues its claim construction ruling.  Velocity promptly and voluntarily supplemented its preliminary infringement contentions following the stay pending reexamination of the patent-in-suit because (1) new claims were added in reexamination and (2) new vehicle models with new features/implementations were introduced during the reexamination.  On the other hand, Defendants have not even responded to Velocity's October 2, 2015 preliminary infringement contentions with the non-infringement contentions required by LPR 2.3(a).  If the Court finds that Velocity has waived its right to assert DOE in this case, then it should likewise rule that Defendants have waived any non-infringement arguments for the new products and claims that were first accused in Velocity's October 2, 2015 initial contentions.

It is difficult to understand how Defendants believe *Recho, LLC v. Spin Master, Ltd.*, No. 13 C 2445, 2014 WL 1088517, at *5 (N.D. Ill. Mar. 17, 2014) supports their waiver argument. In that case, the plaintiff asserted infringement under DOE in its initial contentions, but only included a conclusory allegation.  The court found that Plaintiff had not complied with the LPR 2.2(d), but still granted plaintiff 21 days to amend its contentions.  Likewise, *Spectros Corp. v. Thermo Fisher Sci.*, No. C 09-01996, 2012 WL 1965887 (N.D. Cal. May 31, 2012) is inapplicable here.  In that case, plaintiff argued infringement under DOE on summary judgment without any DOE allegations in its contentions.  Velocity does not have enough information at

this time to determine whether Defendants infringe under DOE (and without a claim construction ruling, cannot determine whether such a theory will be applicable), and is merely reserving its right to do so if this Court's claim construction warrants amending its infringement theories.

## VIII. CONCLUSION

For the aforementioned reasons Velocity respectfully requests that the Court grant Velocity's Motion For Summary Judgment of Infringement and deny Defendants' Motion for Summary Judgment of Indefiniteness and Non-infringement on all grounds.

Dated: January 25, 2016                    Respectfully Submitted

                                           */s/ James A. Shimota*
                                           James A. Shimota

                                           James A. Shimota (IL Bar No. 6270603)
                                           Howard E. Levin (IL Bar No. 6286712)
                                           Aaron C. Taggart (IL Bar No. 6302068)
                                           **HAYNES AND BOONE, LLP**
                                           180 North LaSalle Street, Suite 2215
                                           Chicago, Illinois 60601
                                           Telephone: 312-216-1620
                                           Facsimile: 312-216-1621
                                           jim.shimota@haynesboone.com
                                           howard.levin@haynesboone.com
                                           aaron.taggart@haynesboone.com

                                           ***Counsel for Plaintiff Velocity Patent LLC***


## CERTIFICATE OF SERVICE

    I hereby certify that on January 25, 2016, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


                                           */s/ James A. Shimota*
                                           James A. Shimota

25